ALEXANDER B. SHAW

*v.*

STANDARD PIANO COMPANY.

[Submitted March 13th, 1916.   Decided April 1st, 1916.]

1. Evidence *Held* to show that defendant corporation was insolvent so as to require appointment of a receiver for the safety of the stockholders and the public.

2. The mere fact that the same person was an officer of the assignor of notes and the assignee, would not impute notice to the assignee, in the absence of a showing that such notice came to the officer when acting as a member or officer of the assignee in his official capacity, or that, while acting as an agent of the assignee and within the scope of his authority, he received the information at the time he was actually acting as agent.

3. Under act April 1st, 1912 (*P. L. 1912 p. 535*), stating what acts shall be construed to be those of insolvency on the part of a corporation, it is not necessary that all acts therein mentioned be concurrent, but it is sufficient to warrant the appointment of a receiver that the business of the corporation was conducted at great loss prejudicial to the creditors and stockholders.

4. Under act April 1st, 1912 (*P. L. 1912 p. 535*), providing that the court may proceed in a summary way to hear affidavits as to corporation's insolvency on such notice, if any, as the court directs to be given, it is not necessary that any notice be given the corporation.

On bill for receiver, &c.

*Messrs. Pitney, Hardin & Skinner* and *Mr. J. Weissenbach* (of the Illinois bar), for the complainant.

*Mr. Frank E. Bradner,* for the defendant.

FOSTER, V. C.

The bill and affidavit in this cause were filed with Vice-Chancellor Howell on January 26th, 1916, who determined that the defendant corporation was insolvent and advised an order granting the restraint asked for and appointed a receiver.

On January 27th, 1916, Vice-Chancellor Howell, on application of the defendant, advised an order directing notice of a motion to be given to open the order appointing a receiver in this cause, and permitting defendant to serve its answer and affidavits in support of the motion.

The matter came on for hearing on bill and affidavits, and answer and affidavits, and the oral examination of witnesses on the part of both parties, before Vice-Chancellor Howell, on February 4th and 5th, 1916, and by consent of the parties the hearing was continued before me on February 16th and 17th.

The complainant, Alexander B. Shaw, a resident of Chicago, alleges that defendant, Standard Piano Company, a corporation

of this state, is indebted to him on its unsecured promissory notes for more than $67,857.35, of which, approximately, $16,000 are past due and unpaid. Part of these notes were negotiated to him by the Fort Dearborn National Bank of Chicago, and the remainder by the Hamilton Investment Company, a corporation of the State of Illinois, and, so far as complainant has knowledge, the bank and investment company were *bona fide* holders for value of said notes.

Defendant began business in Newark about April, 1913, with a capital stock of $100,000, of which $60,000 was preferred, and the balance, common stock. The entire preferred stock appears to have been issued to one H. P. Nelson, without consideration, and of the four hundred shares of common stock, one hundred and fifty shares were issued to Nelson for cash and property amounting, as he states, to about $15,000; two hundred and forty-nine shares were issued to Walter L. Hardien and one share to F. W. Bonar, for what consideration, if any, does not appear.

The company's business was the sale of pianos and piano-players on the installment plan, and for the purpose of obtaining money to carry on its business it sold and assigned, from time to time, leases, mortgages or conditional bills of sale, as they have been termed, together with the installment notes secured by the same, which had been obtained from its customers in connection with the purchase of pianos or piano-players.

From the sale of these installment notes and leases the company realized seventy-two per cent. of the face value thereof, the remaining twenty-eight per cent. being held by the purchaser, under the terms of the assignment, as a "General" or "Special Reserve," which was to be paid by the defendant when the amount, with interest, advanced by the purchaser of the notes had been repaid. Provision was also made, in the assignment, for the substitution, from time to time, of other notes and leases to take the place of notes and leases on which the purchasers of the pianos had made default; upon such default the defendant retook possession of the piano and resold it, and used the notes and lease of the new customer to make the substitution mentioned.

Until the past few months none of the customer's notes carried interest, while all the notes issued by the defendant not only carried interest but were also subject to a brokerage charge of eight or ten per cent. additional.

From the books of the company, the testimony and the receiver's report, it appears that the Commercial Security Company had purchased from the defendant such notes and leases aggregating $100,193.45, and that the Federal Commercial Company had also purchased notes and leases to the amount of $130,-111.62, making a total of $230,305.07; that there is due on such notes and leases to the Commercial Security Company and the Federal Commercial Company for money advanced in this way to the defendant the sum of $139,545.71.

The receiver's report shows defendant to have actual assets of $4,950.73, which includes cash in bank, stock on hand, furniture, accounts and other tangible items, the value of which could be definitely determined. This statement of assets does not include the equity in the notes and leases sold and which is called the "General" or "Special Reserve," because the value of this item, if any, is unknown, and, until these notes are paid, the value of this "Reserve" or equity cannot be ascertained; nor does the receiver's report show the value of pianos shipped by defendant in May, 1915, for sale, or repair, to Everhard & Seabold, at St. Johnsville, New York. This concern is now in bankruptcy, and a claim for the pianos, or their value, has been filed on behalf of the defendant, but has not yet been allowed, and, when allowed, it may be subject to a charge for repairs made to these instruments.

The receiver reports liabilities of at least $116,817.42; while defendant admits liabilities of $153,765.94, and claims assets of $263,925.07, complainant contends it has been shown that defendant has assets (crediting it with an estimate value for the possible equity or "Reserve" in the assigned notes and leases) of $178,950.73 and liabilities amounting to $256,351.25, showing a deficit of about $76,000.

Since defendant has been in business it has never realized a dollar from the so-called "Reserve" or equity in the notes and leases assigned by it, but, in the statement prepared for this

hearing, it treats and values this so-called "Reserve" or equity as being worth $104,407.63. In its list of assets, under "Accounts Receivable," it includes the sum of $7,000 that it hopes to receive from the bankrupt estate of Everhard & Seabold for the pianos shipped them for sale or repair.

During the entire period it has been in business defendant has not collected any interest from its customers.

In its statement of assets it includes "Accrued Interests Estimated" of $12,000, without showing on what this estimate is based, and it values its merchandise on hand at $4,000, while the receiver values this merchandise at $2,225. In the statement showing its liabilities, defendant charges itself with "Notes Payable" of $44,300. Its books show, however, that this item amounts to at least $97,000, and, possibly, $102,000.

It further appears from the testimony of the treasurer of the company, Mr. Hardien, that he claims the company has always done a profitable business, and that it made a profit of over $51,000 in the past year; but he is unable to tell what was done with it, or where it is shown in the company's books. On October 5th, 1915, Mr. Hardien wrote the collector of internal revenue, at Newark, explaining why the company had failed to file a statement showing its net annual income for the year 1914. In this letter he states that the company

"became involved in financial difficulties in the fall of 1914; and in the early part of January, 1915, it was deemed advisable to trustee the stock and the affairs of the company to better secure the holders of note obligations of the corporation."

In another paragraph of the letter he adds:

"The corporation did business for the year 1914 at a considerable loss and the affairs of the company have been in the process of liquidating its liabilities since the first of the year."

And it further affirmatively appears that from April, 1915, to January 1st, 1916, the company suffered a loss of many thousands of dollars through defaults, repossessions, returned and exchanged pianos and the expenses of the resale of the same.

From the investigation of defendant's affairs that has been

made in these hearings, I think it clearly appears that defendant is insolvent and cannot, within a short time, resume its business with safety to the public and advantage to its stockholders as contemplated by the statute.

But it is insisted that if this be so, complainant cannot maintain his action as a creditor because of a partial or total failure of consideration for the notes held by him. There is no evidence in the case to justify this contention, except the statement that one Mr. Patterson, an officer of the Federal Commercial Company, was also a director of the Fort Dearborn National Bank, and that by reason thereof the bank was chargeable with any notice or knowledge he acquired in relation to defendant's notes.

While it does not appear that Mr. Patterson ever had knowledge of any infirmity in complainant's notes, if he did, it would not be sufficient to charge the bank, and, therefore, complainant, who acquired from it some of the notes he now holds, with knowledge of the alleged infirmity, unless it further appeared that Mr. Patterson acquired this knowledge while acting as a member of the board of directors of the bank convened in its official capacity (*First National Bank* v. *Christopher, 40 N. J. Law 435*), or that while acting as the agent of the bank, and within the scope of his authority, he received the information at the time he was actually acting as agent in behalf of his principal. *Hanford* v. *Duchastel, 87 N. J. Law 205.*

It is further insisted that the receiver should not have been appointed without notice to the defendant; and because it must be made to appear, not only that the company has become insolvent, but that since the amendment to the Corporation act in 1912 (*P. L. 1912 p. 535 ch. 300*), it must also appear that the corporation is not about to resume its business in a short time thereafter, and that its business has been, and is, being conducted at a great loss and greatly prejudicial to the interest of its creditors and stockholders.

If it were necessary to hold that all the elements mentioned in the amendment of 1912 must be established to give the court jurisdiction, it would be sufficient to say that the evidence shows all of them present in the case at bar. The cases hold, how-

ever, that no such combination of circumstances as is contended for is required. *Empire Trust Co.* v. *Fisher, 67 N. J. Eq. 602; Catlin* v. *Mining Company, 73 N. J. Eq. 286.* In *Bull* v. *International Power Co., 84 N. J. Eq. 209,* Chancellor Walker held that by virtue of the amendment of 1912, a receiver could now be appointed, not only when the corporation had become insolvent, or had suspended its ordinary business for want of funds to carry on the same as authorized by section 65 of the act concerning corporations (Revision of 1896), but, also, if its business has been, or is being, conducted at a great loss and greatly prejudicial to the interest of the creditors and stockholders.

On the question of notice, it is expressly provided by the amendment of 1912 that the court may proceed in a summary way to hear affidavits, &c., upon such notice, if any, as the court may direct to be given.

The evidence is convincing that the defendant corporation is insolvent; that its business has been, and is being, conducted at a great loss and greatly prejudicial to the interest of its creditors and stockholders, and that its business in its present condition cannot be conducted with safety to the public and advantage to the stockholders; and the motion to open the order and discharge the receiver is therefore denied.